# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

OMAR TYSON,
　　　*Plaintiff*,

　　　v.

STATE OF CONNECTICUT
DEPARTMENT OF ENERGY &
ENVIRONMENTAL PROTECTION,
　　　*Defendant*.

No. 3:21-cv-736 (JAM)

## ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Omar Tyson works as a sanitary engineer for the defendant Department of Energy and Environmental Protection ("DEEP"). He alleges a claim for a racially hostile work environment based on the conduct of a co-worker who allegedly subjected him to a years-long campaign of racially-motivated harassment that culminated in the tying of a noose in the window near Tyson's workspace in June 2018.

DEEP has now moved for summary judgment. I will deny the motion because there remain facts in dispute concerning all the elements for Tyson's hostile work environment claim.

### BACKGROUND

Tyson started working for DEEP in 2004.[1] For more than a decade, he had a contentious relationship with one of his co-workers, John Hirschfeld. According to Tyson, Hirschfeld would come into Tyson's cubicle and make comments about "your people" or "you people," which Tyson—who is African American—took to be offensive and racially motivated.[2] Hirschfeld would also comment on Tyson's diploma from Tuskegee University, saying "I bet you people couldn't be [lawyers and doctors back then]."[3] When Tyson's niece was selected as a

---

[1] Doc. #85-2 at 1 (¶ 1); Doc. #90-2 at 1 (¶ 1).
[2] Doc. #90-2 at 9 (¶ 4).
[3] Doc. #90-4 (deposition of Tyson vol. 1) at 74.

commencement speaker at Emerson University, Hirschfeld remarked to Tyson that that was the first time they "had a black girl as a commencement speaker at Emerson."[4] When Tyson asked Hirschfeld to stop coming into his cubicle, Hirschfeld took to elbowing the walls and passing gas in front of Tyson's cubicle as he walked by.[5]

In July 2016, Tyson reported to Lori Saliby (his supervisor) and Mark DeCaprio (a division director) that he suspected Hirschfeld had conducted a background check on him and was spreading rumors about his criminal history.[6] Anne Dana, Principal Human Resources Specialist for DEEP, and Barbara Viadella, Equal Opportunity Manager for DEEP, subsequently met with Tyson to discuss his complaint.[7]

Tyson told Dana and Viadella that he believed Hirschfeld was the one starting rumors about him.[8] Tyson explained that Hirschfeld would come by his cubicle and state "You people should be happy that you have a black President."[9] He told them that Hirschfeld was always saying "you people," which Tyson took to be offensive.[10] As a result, Tyson "refused to have anything to do with [Hirschfeld] and [had] not directly communicated with him since 2011."[11] Tyson also told Dana and Viadella that Hirschfeld would pass gas near his cubicle, walk around barefoot, and close the window blinds in the common area near Tyson's cubicle (which Tyson preferred open).[12] He explained that Hirschfeld was acting this way because of Tyson's race and color.[13]

---

[4] *Id.* at 74-75.
[5] Doc. #90-2 at 9 (¶ 6); Doc. #90-4 at 75.
[6] Doc. #85-2 at 3 (¶ 10); Doc. #90-2 at 2 (¶ 10).
[7] Doc. #85-2 at 3 (¶¶ 13, 15); Doc. #90-2 at 2 (¶¶ 13, 15).
[8] Doc. #85-2 at 4 (¶ 15); Doc. #90-2 at 2 (¶ 15).
[9] Doc. #85-2 at 4 (¶ 16); Doc. #90-2 at 2 (¶ 16).
[10] *Ibid.*
[11] *Ibid.*
[12] Doc. #85-2 at 4 (¶ 17); Doc. #90-2 at 2 (¶ 17).
[13] Doc. #85-2 at 4 (¶ 18); Doc. #90-2 at 2 (¶ 18). Tyson denies this statement but his reasoning is inapposite and appears to have been pasted from a different response.

DEEP subsequently launched an investigation into the source of the rumors. It learned that none of the individuals who had heard about Tyson's criminal history had heard it from Hirschfeld.[14] Instead, the investigation found that the source of the rumors appeared to be three of Tyson's other co-workers who had gathered information about his criminal history via the publicly available Connecticut Judicial Branch website.[15] In response, Saliby held a unit-wide meeting to address the rumors circulating about Tyson and instructed all staff that discussing rumors about co-workers was not permitted and must cease.[16]

To address Tyson's complaint about the blinds, Yvonne Bolton, a Bureau Chief at DEEP, sent Hirschfeld an email explaining that "the blinds do not need to be pulled down" and directing Hirschfeld "to not adjust the blinds near the workspaces of others."[17] Peter Zack, Hirschfeld's supervisor, also instructed Hirschfeld to wear shoes or sandals in the office at all times.[18] As to Tyson's complaints about Hirschfeld's comments about "you people," DEEP concluded that because the relevant behavior had occurred prior to 2011, had ceased by 2016, and was not actionable five years later, there was no disciplinary action they could take against Hirschfeld at that time.[19]

At some point around May 10, 2017, Tyson again complained that Hirschfeld would strike the walls of his cubicle as he passed by.[20] In response, Dana sent Hirschfeld an email

---

[14] Doc. #85-2 at 4-5 (¶ 19); Doc. #90-2 at 2 (¶ 19).
[15] *Ibid.*
[16] Doc. #85-2 at 5 (¶ 20); Doc. #90-2 at 2 (¶ 20).
[17] Doc. #85-2 at 6 (¶ 27); Doc. #90-2 at 3 (¶ 27).
[18] Doc. #85-2 at 7 (¶ 30); Doc. #90-2 at 3 (¶ 30).
[19] Doc. #85-2 at 5-6 (¶¶ 23-25); Doc. #90-2 at 3 (¶¶ 24-25). Tyson denies these statements but in support cites to a part of his deposition in which he describes how Hirschfeld would make comments about "you people" and which does not mention DEEP's decision in 2016 that they would not investigate Hirschfeld's allegedly racist comments further.
[20] Doc. #85-2 at 7 (¶ 32); Doc. #90-2 at 3 (¶ 32).

stating that if he was "striking the cubicle walls of others in the office as you walk by, we would ask that you please discontinue this behavior."[21]

On June 5, 2017, Tyson sent an email to Dana, Viadella, and Saliby, stating that Hirschfeld "AGAIN, just walked by my cubicle and passed gas at the entrance. . . . I need to know what you and the Human Resource Department is going to do to protect me from this ongoing and continuous harassment. . . . We discussed moving him…possibly closer to his supervisor . . . Where do we stand with that?? I AM AT WITS END!!!" (emphasis in the original).[22] The next day Dana informed Hirschfeld that his cubicle would be moved the following day to an area away from Tyson.[23] When Hirschfeld objected to his new location, Dana informed him that he would be moved regardless.[24] And on the day after, Hirschfeld's cubicle was relocated.[25]

On June 13, 2017, Tyson sent Dana an email stating that Hirschfeld had brought a firearm to the DEEP office building and telling Dana that "[o]n more than one recent occasion[], prior to [Hirschfeld] being moved, I heard what I thought sounded like a revolver being spent."[26] In response, DEEP immediately convened a Threat Assessment Team, which met with Tyson on June 15.[27] During the interview, Tyson admitted that he had never seen a firearm in Hirschfeld's possession at any time.[28] He explained that he feared for his safety because Hirschfeld had

---

[21] *Ibid.*

[22] Doc. #85-2 at 7 (¶ 33); Doc. #90-2 at 3 (¶ 33).

[23] Doc. #85-2 at 8 (¶ 36); Doc. #90-2 at 3 (¶ 36).

[24] *Ibid.*

[25] *Ibid.* Later on in his Rule 56(a)(2) statement, Tyson alleges that Hirschfeld was the one who initiated the request to move his cubicle and that DEEP was simply complying with that request rather than disciplining Hirschfeld in any way. *See* Doc. #90-2 at 13 (¶ 33). But this does not refute that Hirschfeld was relocated despite his objections as to his new location. *See also* Doc. #90-4 at 259-60 ("They were complying with his request to be moved. He just didn't like where they was trying to move him to.").

[26] Doc. #85-2 at 9 (¶ 40); Doc. #90-2 at 3 (¶ 40).

[27] Doc. #85-2 at 9 (¶¶ 41-42); Doc. #90-2 at 3 (¶¶ 41-42).

[28] *Ibid.*

previously been disciplined for bringing a concealed firearm to work on several occasions, Hirschfeld would stare at him, pass gas by his cubicle, and strike the walls of his cubicle.[29]

The Threat Assessment Team undertook other steps to investigate Tyson's claim— conducting a search of Hirschfeld's office and state vehicle, investigating whether Hirschfeld had ever been disciplined for bringing a firearm to DEEP, and interviewing other DEEP workers.[30] The Team ultimately could not substantiate Tyson's claim and recommended that DEEP develop a plan to de-escalate the ongoing conflict between Tyson and Hirschfeld.[31]

On June 29, 2017, DEEP issued a formal directive prohibiting Tyson and Hirschfeld from entering one another's work areas.[32] On July 7, Tyson sent an email to Dana stating: "I AM HAPPY! . . . Management required that we keep our distance and I am pleased with the fact that HE cannot enter my work space anymore. . . . I would like to take this opportunity to thank each and every one of you for your assistance in this matter."[33] At this point, DEEP believed it had solved the problem.[34]

That was until February 22, 2018, when Tyson sent Viadella an email stating that Hirschfeld had violated the June 2017 directive by standing approximately 10 feet from Tyson's cubicle.[35] Dana met with Tyson the same day to discuss the issue.[36] On March 2, Tyson sent Dana an email stating his intention to resign from his position due to ongoing harassment from Hirschfeld, citing Hirschfeld's alteration of the window blinds, that he passed gas near Tyson's cubicle, would elbow or kick Tyson's cubicle, was the one who told DEEP about Tyson's license

---

[29] Doc. #85-2 at 10 (¶ 47); Doc. #90-2 at 4 (¶ 47).
[30] Doc. #85-2 at 10-11 (¶¶ 46-49); Doc. #90-2 at 3-4 (¶¶ 46-49).
[31] Doc. #85-2 at 11 (¶ 50); Doc. #90-2 at 4 (¶ 50).
[32] Doc. #85-2 at 11 (¶ 51); Doc. #90-2 at 4 (¶ 51).
[33] Doc. #85-2 at 12 (¶ 54); Doc. #90-2 at 4 (¶ 54).
[34] Doc. #85-2 at 12 (¶ 55); Doc. #90-2 at 4 (¶ 55).
[35] Doc. #85-2 at 12 (¶ 56); Doc. #90-2 at 4 (¶ 56).
[36] *Ibid.*

suspension in 2012, and had spread false rumors about Tyson's criminal record.[37] On March 14, Dana responded that there is no tolerance for harassment at DEEP and assured Tyson that they were currently investigating Tyson's allegation that Hirschfeld had violated the June 2017 directive by coming into Tyson's office space.[38]

On March 22, 2018, DEEP issued Hirschfeld a written reprimand for having violated the June 2017 directive and informed him that "if you violate this direct order, your actions will be considered as insubordination and we will pursue further disciplinary action up to and including termination of your employment."[39]

Nearly two months later on May 15, 2018, Tyson reported to Zack that Hirschfeld had yelled "You Asshole" at Tyson near the elevator banks.[40] Following the incident, Zack met with Hirschfeld, who denied that he had seen Tyson near the elevator or that he had used any profanity in reference to Tyson.[41]

On June 20, 2018, Tyson told Saliby that he had seen a hangman's noose tied into the window blinds in the common area near his cubicle.[42] When Saliby asked whether the noose was still up, Tyson explained that he had taken down the noose to "bait" Hirschfeld into tying it again so that he could catch him in action.[43] DEEP again convened the Threat Assessment Team, which determined that the investigation into the noose should be turned over to the state police.[44]

---

[37] Doc. #85-2 at 12 (¶ 57); Doc. #90-2 at 4 (¶ 57).

[38] Doc. #85-2 at 12 (¶ 58); Doc. #90-2 at 4 (¶ 58).

[39] Doc. #85-2 at 13 (¶¶ 62-63); Doc. #90-2 at 4 (¶¶ 62-63).

[40] Doc. #85-2 at 14-15 (¶ 70); Doc. #90-2 at 5 (¶ 70).

[41] Doc. #85-2 at 15 (¶ 72); Doc. #90-2 at 5 (¶ 72).

[42] Doc. #85-2 at 15 (¶ 75); Doc. #90-2 at 5 (¶ 75).

[43] Doc. #85-2 at 16 (¶ 79); Doc. #90-2 at 5 (¶ 79); see Doc. #90-4 at 256-57 (Tyson told Saliby that he had taken down the noose "because when you're trying to catch a rat, you put the bait in the trap, you set the trap and then you wait").

[44] Doc. #85-2 at 18-19 (¶¶ 92-93); Doc. #90-2 at 6 (¶¶ 92-93). Tyson denies that DEEP commenced an investigation on or around June 20 but only cites to deposition testimony from Tyson's union representative in which she states that she believes DEEP should have done the investigation "quicker" and provides no other facts that would contradict the timeline on which the investigation began. Doc. #90-7 at 91.

The police commenced their investigation on June 27.[45] At the request of the police, DEEP

paused its own investigation while the police investigation was still underway.[46]

On July 6, 2018, DEEP Commissioner Robert Klee sent a message to all staff members

stating "that anything that is done to make our employees feel intimated or harassed is

completely unacceptable and counter to who we are as an agency. Our employees should feel

safe, valued and welcomed. I am deeply troubled and disturbed that staff has felt threatened at

the workplace."[47] On July 11, Tyson responded to Klee's email, stating that he "was pleased

with the notice that went out to staff."[48]

On September 26, 2018, the state police suspended the case for "lack of any physical or

forensic evidence and exhausting any and all leads," concluding that there was "no probable

cause to support the fact that Hirschfeld had" been involved in the noose incident.[49] The same

day, Tyson commenced a medical leave of absence.[50]

On September 7, 2018, Saliby asked Tyson whether he had experienced any issues with

Hirschfeld or anyone else that he had not previously reported. Tyson responded in the negative.[51]

On September 28, 2018, DEEP re-opened its own internal investigation.[52] That

investigation concluded several months later on March 28, 2019 when DEEP was also unable to

---

[45] Doc. #85-2 at 19 (¶ 94); Doc. #90-2 at 6 (¶ 95). Tyson again denies this statement but the portion of the record he cites indicates that the State Police started their investigation about a week after DEEP commenced its own investigation—which is exactly the timeline set forth by the defendant. *See* Doc. #90-7 at 91 ("I don't think the State Police showed up for another week.").

[46] Doc. #85-2 at 19 (¶ 97); Doc. #90-2 at 6 (¶ 97). Tyson denies this statement but points only to a portion of the record in which Tyson's union representative implies that she was not aware whether the police had asked DEEP to pause their own investigation. *See* Doc. #90-7 at 91 ("Q. Are you aware . . . of whether the State Police had instructed DEEP not to interfere with the State Police investigation? A. I don't think the State Police showed up for another week.").

[47] Doc. #85-2 at 19 (¶ 98); Doc. #90-2 at 6 (¶ 98).

[48] Doc. #85-2 at 19 (¶ 99); Doc. #90-2 at 6 (¶ 99).

[49] Doc. #85-2 at 20 (¶ 101); Doc. #90-2 at 6 (¶ 101).

[50] Doc. #85-2 at 20 (¶ 103); Doc. #90-2 at 6 (¶ 103).

[51] Doc. #85-2 at 19 (¶ 100); Doc. #90-2 at 6 (100).

[52] Doc. #85-2 at 20 (¶ 104); Doc. #90-2 at 6 (¶ 104).

substantiate Tyson's allegations as to whether the noose existed and, if it did, who was responsible for it.[53] When Tyson requested that DEEP interview another co-worker besides Hirschfeld whom he suspected may have been responsible for the noose, DEEP acquiesced, finding that there was no evidence to support that the other employee had been involved either.[54]

Tyson returned from his medical leave on May 17, 2019, and at his request was assigned to a separate building from the one in which he used to work.[55] DEEP finally terminated Hirschfeld's employment on August 27, 2019.[56]

Tyson filed this lawsuit on May 28, 2021, against DEEP and DEEP Commissioner Katie Scharf Dykes.[57] The defendants moved to dismiss, which I granted in its entirety. *See Tyson v. Dep't of Energy & Envir. Protection*, 2021 WL 4895898 (D. Conn. 2021). Tyson then amended his complaint.[58] The defendants again moved to dismiss, which I granted in part, allowing only Tyson's hostile work environment claim to proceed against DEEP as the sole defendant.[59] Now following extensive discovery, DEEP has moved for summary judgment.[60]

---

[53] *Ibid.*
[54] Doc. #85-2 at 21 (¶¶ 106-07); Doc. #90-2 at 6 (¶¶ 106-07).
[55] Doc. #85-2 at 22 (¶ 115); Doc. #90-2 at 7 (¶ 115).
[56] Doc. #85-2 at 22 (¶ 118); Doc. #90-2 at 7 (¶ 118).
[57] Doc. #1.
[58] Doc. #35.
[59] Doc. #47.
[60] Doc. #85.

**DISCUSSION**

The principles governing review of a motion for summary judgment are well established.

Summary judgment may be granted only if "the movant shows that there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). I must view the facts in the light most favorable to the party who opposes the motion for

summary judgment and then decide if those facts would be enough—if eventually proved at

trial—to allow a reasonable jury to decide the case in favor of the opposing party. My role at

summary judgment is not to judge the credibility of witnesses or to resolve close, contested

issues of fact but solely to decide if there are enough facts that remain in dispute to warrant a

trial. *See generally Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (*per curiam*); *Union Mut. Fire

Ins. Co. v. Ace Caribbean Mkt.*, 64 F.4th 441, 445 (2d Cir. 2023).[61]

### *Hirschfeld's pre-April 2018 conduct*

DEEP first contends that the majority of conduct involving Hirschfeld is time-barred. A

Title VII discrimination claim must be brought within three hundred days of the date when the

alleged unlawful employment practice occurred. See 42 U.S.C. § 2000e-5(e)(1). Tyson first filed

his complaint with the Connecticut Commission on Human Rights and Opportunities on January

29, 2019, making the applicable cutoff date April 4, 2018. Therefore, DEEP argues, any of

Tyson's claims based on conduct that occurred before April 4, 2018 are time-barred.[62]

But DEEP's argument fails because of the continuing-course-of-conduct exception that

applies to hostile work environment claims. "Provided that an act contributing to the [hostile

work environment] claim occurs within the filing period, the entire time period of the hostile

---

[61] Unless otherwise indicated, this ruling omits internal quotation marks, alterations, citations, and footnotes in text quoted from court decisions.
[62] Doc. #85-1 at 20-21.

environment may be considered by a court for the purposes of determining liability." *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002). And so "if a plaintiff has experienced a continuous practice and policy of discrimination," then "the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it." *Fitzgerald v. Henderson*, 251 F.3d 345, 359 (2d Cir. 2001). Therefore, "a hostile work environment claim is timely filed even if only one act contributing to the hostile work environment occurred within the applicable limitations period." *Johnson v. County of Nassau*, 2014 WL 4700025, at *10 (E.D.N.Y. 2014).

Tyson alleges that at least two incidents occurred after the April 4 cutoff date: Hirschfeld called him an "asshole" outside the elevators, and Tyson discovered a noose tied into the window cords near his office. As Tyson explains, both instances were part of a campaign of abuse spanning "almost a dozen years."[63] Indeed, the conflict between Hirschfeld and Tyson appears to have been a long-simmering one, beginning with Hirschfeld's "you people" comments and re-igniting on multiple occasions: in 2016 when Tyson accused Hirschfeld of spreading rumors about him, in 2017 when Tyson suspected Hirschfeld of bringing a gun into the workplace after Hirschfeld said he was mugged by a "black guy," in 2018 when Hirschfeld called Tyson an "asshole," and finally when Tyson identified Hirschfeld as the person who tied the noose.

Viewing the facts in the light most favorable to Tyson as I must at this stage, it is reasonable to see these incidents not as isolated events but rather as part of a continuing course of conduct extending as far back as 2011.[64] The pre-April 2018 conduct is therefore "part of the same hostile work environment" as the post-April 2018 incidents and can properly be considered

---

[63] *See* Doc. #90-5 at 28.
[64] Doc. #90-2 at 2 (¶ 11) ("Tyson testified that Hirschfeld would make racist comments as early as 2011.").

in evaluating Tyson's claim. *See Sanderson v. New York State Elec. & Gas Corp.*, 560 F. App'x

88, 91 (2d Cir. 2014).

DEEP objects that Hirschfeld's "asshole" comment cannot be related to the prior events

because it is not plausibly connected to Tyson's race.[65] But "facially [race]-neutral conduct may

sometimes be used to establish a course of [race]-based discrimination when analyzed among the

totality of the circumstances surrounding a hostile work environment claim." *Johnson v.*

*Connecticut*, 2020 WL 5594120, at *6 (D. Conn. 2020). A component act "need not be

actionable on its own" as long as "each act is part of the whole." *McGullam v. Cedar Graphics,*

*Inc.*, 609 F.3d 70, 77 (2d Cir. 2010) (noting that the "sufficiently related" standard is different

from the "severe or pervasive" standard, which goes to the merits of the hostile work

environment claim).

DEEP also argues that Tyson has not asserted any facts that show Hirschfeld was the one

that tied the noose, and so has not demonstrated that the noose is related to any of Hirschfeld's

prior alleged conduct. But as I discuss in greater detail below, the identity of the person who tied

the noose (if anyone tied a noose at all) remains a fact in dispute that I cannot properly resolve

on summary judgment. Accordingly, evidence of Hirschfeld's conduct prior to April 4, 2018

may properly be considered in evaluating this motion for summary judgment.[66]

### Hostile work environment

DEEP next challenges the merits of Tyson's hostile work environment claim. A hostile

work environment claim requires proof that the workplace was permeated with discriminatory

intimidation, ridicule, or insult that was sufficiently severe or pervasive to alter the conditions of

---

[65] Doc. #85-1 at 23.
[66] My continuing-course-of-conduct determination is solely for purposes of summary judgment. At trial DEEP may
ask for a jury instruction that the jury should not consider any conduct prior to April 4, 2018, if it determines that
there was no continuing course of conduct linking events prior to that date with events after it.

the plaintiff's employment and thus to create an abusive working environment. A plaintiff must show: (1) that the plaintiff subjectively perceived the environment to be abusive; (2) that objectively the environment was actually hostile and abusive; (3) that the hostile work environment was because of the plaintiff's protected status (such as the plaintiff's race, sex, religion, or membership in another protected class); and (4) that the hostile work environment is attributable to the employer. *See generally Agosto v. New York City Dep't of Educ.*, 982 F.3d 86, 101-02 (2d Cir. 2020); *Legg v. Ulster Cty.*, 979 F.3d 101, 114-15 (2d Cir. 2020).

### Element one—subjective perception

As to the first element, DEEP does not contest that Tyson subjectively perceived his working environment to be abusive. And the record fully bears out Tyson's sustained frustration with Hirschfeld and his belief that Hirschfeld's actions were motivated by Tyson's race.[67] Indeed, according to Tyson, his experience was so severely negative that a therapist later diagnosed him with post-traumatic stress disorder, anxiety, and depression stemming in part from his continued conflict with Hirschfeld.[68] Accordingly, there remains a genuine fact issue as to the first element of Tyson's hostile work environment claim.

### Element two—objectively hostile

As to the second element, a court considers "the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's [job] performance." *Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 387 (2d Cir. 2020).

---

[67] *See* Doc. #90-2 at 9 (¶ 4) (Tyson found Hirschfeld's comments about "your people" to be "deeply offensive and racially motivated"); *id.* at 10 (¶ 12) (Tyson felt Hirschfeld was passing gas in front of his cubicle "due to racial hostility"); *id.* at 11 (¶ 17) (Tyson felt that "Hirschfeld's threat of the sound of a revolver chamber spinning was intimidation and racial harassment"); *ibid.* (¶ 21) (Hirschfeld's "race-based harassment . . . of [Tyson] became so difficult that [Tyson] indicated to HR that he was considering leaving the Agency").
[68] Doc. #90-5 (deposition of Tyson vol. 2) at 104-05.

Objective hostility is "assessed from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances including the social context in which particular behavior occurs and is experienced by its target." *Dymskaya v. Orem's Diner of Wilton, Inc.*, 2015 WL 1038394, at *4 (D. Conn. 2015). While conduct must typically be pervasive to sustain a hostile work environment claim, "a single episode of harassment can establish a hostile work environment if the incident is sufficiently severe." *Williams v. New York City Housing Authority*, 61 F.4th 55, 74 (2d Cir. 2023).

Reading the record in the light most favorable to Tyson, I find that a reasonable jury could conclude that at least two distinct events meet this standard. First, Tyson claims that he saw a noose tied into the window cords near his office in June 2018. "[T]he noose is among the most repugnant of all racist symbols, because it is itself an instrument of violence." *Williams v. New York City Housing Authority*, 154 F. Supp. 2d 820, 824 (S.D.N.Y. 2001). And "courts have found that even limited display of a noose can quickly precipitate a hostile work environment." *Smith v. Town of Hempstead Dep't of Sanitation Sanitary Dist. No. 2*, 798 F. Supp. 2d 443, 452 (E.D.N.Y. 2011). If indeed what Tyson saw in the window cords near his office was a noose, that would be sufficient to support his claim of workplace hostility.

Second, Tyson claims that Hirschfeld brought a firearm to DEEP "no less than a dozen times" and would spin the revolver in the cubicle next to Tyson.[69] As Tyson explains, the sound made him "fear for [his] life."[70] "[E]vidence of physical threats is highly probative of the severity of the alleged hostile work environment." *Castagna v. Luceno*, 558 F. App'x 19, 21 (2d Cir. 2014). Even conduct which "is merely episodic and not itself severe," with the addition of "physically threatening" behavior, "may cause offensive or boorish conduct to cross the line into

---

[69] *See* Doc. #90-1 at 7; *see also* Doc. #90-4 at 133 (Tyson heard Hirschfeld's gun "on multiple occasions").
[70] Doc. #90-5 at 106.

actionable . . . harassment." *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 547 (2d Cir. 2010). A factfinder could therefore well conclude that implied threats of gun violence tip the scales into severe hostility.

DEEP objects that Tyson's evidence as to the noose's existence is "neither plausible nor believable."[71] It points to Tyson's conflicting testimony as to when and where he saw the noose, the fact that both the state police and DEEP could not substantiate the existence of a noose, and that Tyson deleted the original picture of the noose.[72] But Tyson insists in sworn deposition testimony that he saw not one noose but two in 2018.[73] And so it ultimately comes down to a question of whether a factfinder would credit Tyson's testimony against the findings of the state police department and DEEP—which is not a proper question for resolution on summary judgment.

DEEP similarly argues that Tyson's allegation that Hirschfeld brought a firearm to the office was "fully investigated" and "unsubstantiated."[74] But again, whether Tyson's claims are credible remains a question of fact not suitable for disposition on a motion for summary judgment.

DEEP additionally argues that the rest of Hirschfeld's conduct—including his verbal comments and his habit of elbowing Tyson's cubicle—was not frequent, severe, or pervasive enough to alter the conditions of Tyson's employment.[75] But the question is whether the "totality of the circumstances" creates triable issues of fact. *See Bacchus v. New York City Dept. of Educ.*, 137 F. Supp. 3d 214, 241 (E.D.N.Y. 2015) (while disciplinary meetings on their own were too

---

[71] Doc. #85-1 at 25.
[72] *Ibid.*
[73] Doc. #90-4 at 254-56.
[74] Doc. #85-1 at 27.
[75] Doc. #85-1 at 24.

sporadic to support a finding of pervasiveness, taken in light of frequent comments on plaintiff's race the "totality of the circumstances" created issues of fact as to whether there was severe and pervasive discriminatory conduct).

Given that Hirschfeld's comments about "you people" and "you asshole" were allegedly accompanied with more overt threats of physical violence, a reasonable jury could find that the entirety of the situation created an objectively hostile work environment. *See also Rasmy*, 952 F.3d at 390 ("By its very nature" determination of the "overall severity and pervasiveness of discriminatory conduct . . . is bound to raise factual disputes that likely will not be proper for resolution at the summary judgment stage."). Accordingly, there remains a genuine fact issue as to the second element of Tyson's hostile work environment claim.

### Element three—on account of race

As to step three, there also remain facts in dispute as to whether the abusive conduct Tyson suffered was due to his race. There can be no question that the noose is "among the most repugnant of all racist symbols" and "itself an instrument of violence." *New York City Housing Authority*, 154 F. Supp. 2d at 824. If there was indeed a noose in Tyson's window then there can be "no dispute that . . . the noose[ is] connected to race." *Brown v. Orange & Rockland Utilities, Inc.*, 594 F. Supp. 2d 382, 391 (S.D.N.Y. 2009).

DEEP responds that because the perpetrator of the noose is unknown, Tyson cannot show that the noose was racially motivated.[76] It is possible, as DEEP contends, that the noose was "nothing more than the cord looped together to keep it off of the ground by someone who had no racial motivation at all."[77] Yet it is also possible, as Tyson contends, that it was in fact a noose. This is not a case where "no reasonable person would conclude the objects to be anything so

---

[76] Doc. #85-1 at 26.
[77] *Ibid.*

violent or racially charged as a noose." *Cf. Davis v. New York Department of Corrections*, 256 F. Supp. 3d 343, 352 (S.D.N.Y. 2017) (where photographic evidence revealed that the "noose" was just the torn zipper of a resealable plastic bag attached to a piece of twine, no reasonable juror could conclude that it resembled a noose). And so the question should go to a factfinder.

While courts have declined to impute the tying of nooses to accused individuals when "there is no admissible evidence to connect the noose incidents" to those persons, that is not this case. *See Wilson v. New York City Dept. of Transp.*, 2005 WL 2385866, at *22 (S.D.N.Y. 2005). In sworn deposition testimony Tyson states that he believes Hirschfeld was the one who tied the noose in the window shades.[78] And there is enough other circumstantial evidence to suggest that Hirschfeld was responsible—namely, that the noose was tied into the same window blinds Hirschfeld would often adjust against Tyson's wishes, as well as the multi-year history of Tyson's contentious and race-based relationship with Hirschfeld. *See Brockman v. NAES Corporation*, 2021 WL 863471, at *5 (D. Conn. 2021) (jury could reasonably conclude in light of the "timing and other circumstances," including generally abusive verbal treatment, that plaintiff's co-worker was responsible for drawing of a swastika); *see also Morrow v. Bauersfeld*, 2022 WL 17097590, at *2 (2d Cir. 2022) (in the absence of direct evidence, "sufficiently compelling" circumstantial evidence may be considered to defeat a motion for summary judgment). Ultimately, at this stage of the litigation, I cannot discount Tyson's account as to the noose, and the question must proceed to trial. *See Orange & Rockland Utilities, Inc.*, 594 F. Supp. 2d at 392-93 (on summary judgment court must credit the plaintiff's assertion that it was his co-worker who put up two nooses).

---

[78] *See, e.g.*, Doc. #90-4 at 256-57 ("That's when I said to her, Lori, [Hirschfeld's] tying nooses at my desk, in those exact words."); *id.* at 316 ("What I can tell you with 100 percent certainty that [sic] I found [the noose] in my workplace and I suspect it was John [Hirschfeld].").

Tyson has also alleged enough facts to put in dispute whether Hirschfeld brought a revolver into work for racially motivated reasons. As Tyson explains in his deposition testimony, he began hearing the sound of a revolver from Hirschfeld's office after Hirschfeld told Tyson that he was mugged "by [a] black guy" and asserted that "[i]t's never going to happen to me again."[79] Tyson also testified in his deposition that Hirschfeld carried around a cane which he would hold up and point at Tyson, in a way Tyson took to mimic pointing a gun at him.[80] On these facts a reasonable jury could find that Hirschfeld's actions implied violence linked to Tyson's race.

Hirschfeld's comments to Tyson about "your people" also raise an issue of fact whether the context and content of his statements were racially motivated.[81] As Tyson explains, Hirschfeld's "mannerisms" and "history of comments" made him believe that Hirschfeld's remarks were negatively tied to Tyson's race rather than neutral observations about, *e.g.*, Martin Luther King, Jr. Day.[82] As the Supreme Court has explained, certain words standing alone might appear to be benign but nonetheless may be understood as racist code words, which may in part depend on the speaker's inflection, tone of voice, local custom, and historical usage. *See Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006) (*per curiam*). And "the use of code words such as 'all of you' and 'one of them' could be sufficient evidence from which a jury could find an intent to discriminate." *Brockman*, 2021 WL 863471, at *4 (quoting *Abramson v. William Paterson College of New Jersey*, 260 F.3d 265, 278 (3d Cir. 2001)).

---

[79] Doc. #90-4 at 136-39. At another point in his deposition Tyson also suggests that Hirschfeld told Tyson that "your people are never going to rob me again." *See* Doc. #90-4 at 188.
[80] Doc. #90-2 at 11 (¶ 20); *see also* Doc. #90-4 at 189-90.
[81] DEEP argues that because the "your people" comments stopped before 2011 they are not pervasive enough to support a hostile work environment claim. Doc. #85-1 at 27. But Tyson states in his deposition that Hirschfeld would make comments about Booker T. Washington as late as 2017. *See* Doc. #90-4 at 85-86.
[82] Doc. #90-4 at 78.

DEEP responds that much of Hirschfeld's alleged behavior—including fiddling with the window blinds, passing gas near Tyson's cubicle, and kicking the walls of Tyson's cubicle—is not related to Tyson's race.[83] But Tyson alleges that Hirschfeld only began doing these things after he asked Hirschfeld to stop coming into his cubicle and making comments about "your people."[84] Given the timing and context of Hirschfeld's conduct, a jury could conclude that Hirschfeld's non-verbal acts were also related to Tyson's race. And "when the same individuals engage in some harassment that is explicitly discriminatory and some that is not, the entire course of conduct is relevant to a hostile work environment claim." *Rasmy*, 952 F.3d at 388. Even if Tyson cannot show that each and every one of Hirschfeld's comments (or kicks) was racially motivated, there are enough facts in dispute as to whether at least some of the conduct was because of Tyson's race to preclude summary judgment on this question. Accordingly, there remains a genuine fact issue as to the third element of Tyson's hostile work environment claim.

### Element four—attribution to DEEP

The final element goes to whether the racially hostile work environment created by Hirschfeld is properly attributable to DEEP. Employers are not automatically liable for an abusive environment created by their employees. They may raise a defense "that (1) the employer exercised reasonable care to prevent and correct promptly any discriminatory harassing behavior, and (2) the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Miller v. New York State Police*, 2022 WL 1133010, at *3 (2d Cir. 2022).

Where, as here, it is non-supervisory co-workers that create a hostile work environment, the employer is liable for the existence of that environment only if it "knew or reasonably should

---

[83] Doc. #85-1 at 27.
[84] Doc. #90-4 at 75.

have known about [the] harassment . . . 'yet failed to take appropriate remedial action.'" *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 153 (2d Cir. 2014); *Bentley v. AutoZoners, LLC*, 935 F.3d 76, 92 (2d Cir. 2019) (applying negligence standard where hostile work environment is created by a co-worker who is not a supervisor).

Neither party contests that DEEP was aware of Hirschfeld's alleged behavior. As the record shows, Tyson repeatedly complained about Hirschfeld conduct to Saliby, Dana, and Viadella, as well as to other supervisors at DEEP beginning in at least 2016. Tyson also communicated his belief that Hirschfeld's conduct was motivated by Tyson's race in many of these conversations.[85] A reasonable jury could therefore conclude that DEEP was or should have been on notice of a potentially hostile work environment.

The next question is whether DEEP's response to Hirschfeld's behavior was reasonable in light of the "totality of circumstances," considering factors including "the gravity of the harm being inflicted upon the plaintiff, the nature of the employer's response in light of the employer's resources, and the nature of the work environment." *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 65 (2d Cir. 1998).

Tyson argues that DEEP's response to his complaints about Hirschfeld were inadequate because DEEP should have fired Hirschfeld after he was found to have gone into Tyson's workspace four times in violation of the June 2017 formal directive.[86] He points to a Last Chance Agreement between DEEP and Hirschfeld, which was signed in November 2008 and

---

[85] *See* Doc. #90-6 at 74-75 (Tyson told his supervisor and manager "about being persecuted in a hostile work environment and that he thought it was racial," which the supervisor and manager passed along to Dana); Doc. #90-7 at 109-10 (deposition of Dawn McKay) (Tyson told Dana "almost at every meeting" that he felt Hirschfeld was targeting him because of his race). DEEP contends that Tyson did not disclose any "racially hostile conduct" to DEEP. Doc. #95 at 8. But that is belied by the record, which demonstrates that Tyson was vocal to his superiors about his belief that Hirschfeld was motivated by racial animus. And to the extent DEEP is arguing that none of the incidents cited by Tyson to his supervisors supported his claim that Hirschfeld's conduct was racially motivated, that presumes the answer to a factual question that remains in dispute at this stage of the litigation.
[86] Doc. #90-1 at 17-18.

which states that "[i]n the event Mr. Hirschfeld engages in conduct in violation of the State of Connecticut or Department of Environmental Protection Workplace Violence Policies, this discipline may be considered toward progressive discipline and, his employment with the Department of Environmental Protection may be terminated."[87] As Tyson contends, when Hirschfeld violated the June 2017 directive, DEEP should have considered this a violation of its workplace policies and terminated Hirschfeld's employment accordingly.

A reasonable finder of fact could agree with Tyson. Certainly "nothing requires an employer to automatically fire one employee based on another's complaints." *Scoppettone v. Mamma Lombardi's Pizzico, Inc.*, 523 F. App'x 73, 75 (2d Cir. 2013). But "[t]he appropriateness of an employer's remedial action must be assessed from the totality of the circumstances." *Turley*, 774 F.3d at 153. Hirschfeld had been under the Last Chance Agreement for almost a decade when he began going into Tyson's workplace in direct contravention of a clear order from his supervisors. As Dana acknowledged in deposition testimony, DEEP "could [have] move[d] forward with a termination" at that point given Hirschfeld's history.[88] A reasonable jury could credit that statement and conclude that DEEP's response to Hirschfeld was therefore not "effectively remedial and prompt." *See Duch v. Jakubek*, 588 F.3d 757, 767 (2d Cir. 2009).

DEEP insists that it responded to all of Tyson's complaints about Hirschfeld—including referrals to the state police and internal investigations—and intervened on several occasions when warranted.[89] The record does indeed show that DEEP took many steps to address Tyson's concerns—telling Hirschfeld to stop hitting the walls of Tyson's cubicle and passing gas near his office, and assembling a Threat Assessment Team on two occasions to investigate Tyson's

---

[87] Doc. #90-11 at 2 (¶ 2).
[88] *See* Doc. #90-6 at 96-97.
[89] Doc. #95 at 8.

claims that Hirschfeld had brought a firearm into the office and tied a noose into the window cords.

The standard, however, is not whether an employer took *any* action in response to a potentially hostile work environment. It is whether the employer's response was "reasonable under the circumstances to combat [the] offensive conduct." *Russell v. New York University*, 739 F. App'x 28, 30 (2d Cir. 2018). DEEP has strong arguments but has not put the answer to that question beyond dispute, and so there remains a genuine fact issue as to the fourth element of Tyson's hostile work environment claim.

All in all, there remain genuine issues of fact as to all four elements of Tyson's hostile work environment claim. Accordingly, I will deny DEEP's motion for summary judgment.

CONCLUSION

For the reasons stated above, the Court denies the motion for summary judgment.

It is so ordered.

Dated at New Haven this 15th day of September 2023.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge